DONNA W. LOW, Bar No. 148874
NICHOLAS J. LEONARD, Bar No. 260322
LOW McKINLEY & SALENKO, LLP
2150 River Plaza Drive, Suite 250
Sacramento, CA 95833
Telephone:    (916) 231-2400
Facsimile:    (916) 231-2399
Email: dwl@lmblaw.net
Email: njl@lmblaw.net

Attorneys for Defendant(s) DIGNITY HEALTH DBA
BAKERSFIELD MEMORIAL HOSPITAL

# UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY VICKERS ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILD D.H., <br><br> Plaintiff(s), <br><br> vs. <br><br> MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, DIGNITY HEALTH D/B/A BAKERSFIELD MEMORIAL HOSPITAL, CHILDREN'S HOSPITAL LOS ANGELES, AND DOES 1-10, INCLUSIVE, <br><br> Defendant(s). | Case No.: 1:22-cv-00773-JLT-BAK <br><br> **DECLARATION OF NICHOLAS J. LEONARD IN SUPPORT OF DEFENDANT DIGNITY HEALTH'S MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6) AND TO STRIKE THE COMPLAINT FOR DAMAGES PURSUANT TO FRCP 12(f)** <br><br> **Date:    August 12, 2022** <br> **Time:    9:00 a.m.** <br> **CR:    4, 7th Floor** <br> **Assigned for All Purposes to:** <br> **Honorable Judge Jennifer L. Thurston** <br><br> **Complaint Filed: April 6, 2022** <br> **Action Removed: June 23, 2022** <br> **Trial Date: None Set** |

I, NICHOLAS J. LEONARD, declare:

1.    I am an attorney licensed to practice in the Eastern District of California and am a member of the law firm Low McKinley & Salenko, LLP, attorneys of record for Defendant DIGNITY HEALTH DBA BAKERSFIELD MEMORIAL HOSPITAL.

2.      On April 6, 2022, Plaintiffs filed the Complaint for Damages in this matter.  The sole cause of action against Defendant DIGNITY HEALTH DBA BAKERSFIELD MEMORIAL HOSPITAL is the sixth cause of action for Negligent Failure to Warn.  Notably, the Complaint alleges that Bakersfield Memorial Hospital "negligently supplied and distributed the Defendant Manufacturers' milk-based infant feeding products" to healthcare professionals and medical staff at Bakersfield Memorial Hospital for use on premature infants like Plaintiff D.H. (Complaint, pp. 23:6-8.) I have attached a true and correct copy of the Complaint as **Exhibit A**.

3.      On June 16, 2022, I sent Plaintiffs' counsel a Meet and Confer letter outlining Defendant DIGNITY HEALTH DBA BAKERSFIELD MEMORIAL HOSPITAL's objections to the Complaint.  Notably, I informed Plaintiffs' counsel that the Complaint improperly alleges a negligent failure to warn cause of action against a hospital, improperly includes Ashley Vickers as an individual Plaintiff, improperly uses a pseudonym for Plaintiff D.H., improperly prays for punitive damages in violation of Code of Civil Procedure section 425.13(a) and Civil Code section 3294, and improperly seeks attorney fees in violation of Code of Civil Procedure section 1033.5.  I have attached a true and correct copy of my Meet and Confer letter as **Exhibit B**.

3.      On June 21, 2022, I discussed my objections to the Complaint via telephone with Plaintiffs' counsel Paige Alderson of Grant & Eisenhofer, P.A.  Despite the best efforts of both sides, the parties were not able to informally resolve Defendant DIGNITY HEALTH DBA BAKERSFIELD MEMORIAL HOSPITAL's objections to the Complaint and Defendant now must proceed with this Motion to Dismiss and Motion to Strike the Complaint.

4.      This motion is made following the conference of counsel pursuant to the Court's standing order which took place on June 21, 2022.

///

1     5.     On June 23, 2022, Co-Defendant ABBOTT LABORATORIES filed a Notice of

2  Removal to Federal Court.  At the time of Removal, Defendant Dignity Health had filed a Demurrer

3  and Motion to Strike the Complaint in Kern County Superior Court.  The Demurrer and Motion to

4  Strike were scheduled for hearing on July 19, 2022.

5     I declare under penalty of perjury under the laws of the State of California the foregoing is

6  true and correct and if called to testify I could competently do so.

7     Dated this 30th day of June 2022, in Sacramento, California.

8

9     By   _____

              NICHOLAS J. LEONARD

DECLARATION OF NICHOLAS J. LEONARD

**Vickers v. Mead Johnson & Company, LLC**

**Case No:  1:22-CV-00773-JLT-BAK**

# EXHIBIT A

**Exhibit A**

ELECTRONICALLY FILED
4/6/2022 1:25 PM
Kern County Superior Court
By Vickie Fogerson, Deputy

M. Elizabeth Graham (Bar No.143085)
**GRANT & EISENHOFER, P.A.**
201 Mission Street, Suite 1200
San Francisco, CA 94105
Telephone: (415) 293-8210
Fax: (415) 789-4367
Email: egraham@gelaw.com

Paige J. Alderson (Pro Hac Vice forecoming)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7131
Fax: (302) 622-7100
Email: palderson@gelaw.com

Fidelma Fitzpatrick (Pro Hac Vice forthcoming)
Carmen Scott (Pro Hac Vice forthcoming)
Laura Stemkowski (Pro Hac Vice forthcoming)
**MOTLEY RICE LLC**
55 Cedar Street, Suite 100
Providence, RI 02903
Telephone: (401) 457-7728
Facsimile (401) 457-7708
Email: ffitzpatrick@motleyrice.com
Email: cscott@motleyrice.com
Email: lstemkowski@motleyrice.com

*Attorneys for Plaintiffs*

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF KERN**

| | |
|---|---|
| ASHLEY VICKERS, Individually, and D.H., a minor child by and through a guardian ad litem, Ashley Vickers,<br><br>*Plaintiffs,*<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, DIGNITY HEALTH D/B/A BAKERSFIELD MEMORIAL HOSPITAL, CHILDREN'S HOSPITAL LOS ANGELES, and DOES 1-10, inclusive,<br><br>*Defendants.* | Case No. BCV-22-100810<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>(1) Strict products liability for design defect<br>(2) Strict products liability for failure to warn<br>(3) Negligence<br>(4) Intentional misrepresentation<br>(5) Negligent misrepresentation<br>(6) Negligent failure to warn |

Plaintiffs bring this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories, (collectively "the Defendant Manufacturers"), and Dignity Health d/b/a Bakersfield Memorial Hospital ("Dignity"), and Children's Hospital Los Angeles (collectively "The Hospitals"), together "Defendants." Plaintiffs allege the following upon personal knowledge as to Plaintiffs' own acts and experiences and upon information and belief, including investigation conducted by Plaintiffs' attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by premature infants (collectively, the "Injured Infants") who were given the Defendant Manufacturers' cow's milk-based infant feeding products at the Hospitals.  The Hospitals acquired and supplied the Defendant Manufacturers' products to the Injured Infants and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.  This caused the Injured Infants to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.  As a result, the Injured Infants were seriously injured, resulting in their death or long-term health effects and accompanying harm to their parents (collectively "Plaintiff Parents").

2.    Plaintiffs bring these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infants' consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infants by the Bakersfield Memorial Hospital and Children's Hospital Los Angeles.

## II.    PARTIES

3.    Plaintiff Ashley Vickers is a natural person and a resident of the State of California.  Ms. Vickers is the mother of D.H., a minor.

4.    Plaintiff D.H. is a natural person and a resident of the State of California.  D.H. is a minor child of Ashley Vickers.

5.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware.  Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware.  Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

6.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

7.      Defendant Bakersfield Memorial Hospital is a corporation incorporated under the laws of the State of California.  Its principal place of business is in California.

8.      Defendant Children's Hospital Los Angeles is a corporation incorporated under the laws of the State of California.  Its principal place of business is in California.

## III.      JURISDICTION AND VENUE

9.      This Court has jurisdiction in this matter pursuant to California Code of Civil Procedure § 410.10.  Defendants conduct authorized business in the State of California.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this State. This suit arises out of Defendants' forum-related activities, such that the Superior Court's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

10.      Venue is proper pursuant to California Code of Civil Procedure § 395.5 because Defendants Bakersfield Memorial Hospital has its principal place of business in Bakersfield County.

11.      This action is an unlimited civil case because the amount of damages requested exceeds $25,000 and because none of the Plaintiffs' causes of action meet the criteria for limited civil cases in the California Code of Civil Procedure.

## IV.      FACTUAL ALLEGATIONS

### *D.H.'s NEC Diagnosis*

COMPLAINT AND DEMAND FOR JURY TRIAL

12.     D.H. was born prematurely at Bakersfield Memorial Hospital in Bakersfield, California on November 2, 2021.

13.     D.H. was fed Similac and/or Enfamil cow's milk-based products by staff at the Hospitals from shortly after his birth.

14.     Shortly after D.H. first ingested the Defendant Manufacturers' products, he developed NEC.

15.     D.H. was forced to stay in the NICU longer, treated with antibiotics and Occupational Therapy and has continued to suffer long term health issues.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

16.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

17.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

18.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

19.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

20.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of

- 4 -

1    NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast
2    milk-based fortifier.

3    21.    A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding,
4    warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of
5    necrotizing enterocolitis." The report also states that premature infants who are not breastfed are
6    138% more likely to develop NEC.

7    22.    The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to
8    the optimal physical, mental, and social health and well-being for all infants, children, adolescents,
9    and young adults," has advised that all premature infants should be fed either their mother's milk or,
10   if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based
11   on the "potent benefits of human milk," including "lower rates of . . . NEC."

12   23.    A multicenter, randomized, controlled trial found that premature and low-birth-weight infants
13   fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-
14   birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

15   24.    Another study conducted a randomized comparison of extremely preterm infants who were
16   given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing
17   variable amounts of cow's milk-based products.  The babies given exclusively breast milk products
18   suffered NEC 5% of the time.  The babies given cow's milk products suffered NEC 17% of the time.

19              ***Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist***

20   25.    A range of options are available that allow preterm and low-birth-weight infants to be fed
21   exclusively human milk-based nutrition.  For example, in addition to the mother's own milk, an
22   established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover,
23   hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

24   26.    A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition
25   necessary to support premature and low-birth-weight infants without the elevated risk of NEC
26   associated with cow's milk-based products.  For example, in a study analyzing preterm infants who
27   were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded
28   standard growth targets and met length and head-circumference growth targets, demonstrating that

1    infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast

2    milk-based diet.  This is particularly true given the ability of breast milk-based fortifiers to provide

3    the additional nutritional supplements necessary for adequate growth while receiving the protective

4    benefits of a breast milk diet.

5    27.    The Defendant Manufacturers' products not only pose a threat to infants' health, but also

6    displace the breast milk they could otherwise receive.  This displacement only increases infants'

7    vulnerability to NEC, as studies show that breast milk protects against the disease.  For example, a

8    study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-

9    based diet is associated with significant benefits for extremely premature infants and that it produced

10   no feeding-related adverse outcomes.

11   28.    For the above reasons, experts acknowledge that breast milk is the best source of nutrition for

12   preterm infants and those at risk for NEC.  Breast milk-based nutrition nourishes infants while

13   creating a significantly lower risk of NEC.

14   29.    At the time the Injured Infants were fed the Defendant Manufacturers' products, the science

15   clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood

16   that a baby will develop NEC, leading to severe injury and often death.

17   30.    Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products

18   present a dire threat to the health and development of preterm infants, the Defendant Manufacturers

19   have made no changes to their products or the products' packaging, guidelines, instructions, or

20   warnings.  Instead, they have continued to sell their unreasonably dangerous products.  In addition,

21   they incentivize hospitals that know the risks to use their products by providing them to the hospital

22   for free or at a significant discount, in order that vulnerable infants and their families will become

23   accustomed to using their products before discharge.

*The Defendant Manufacturers' False And Misleading Marketing*

*Regarding Cow's Milk-Based Infant Products*

26   31.    Abbott and Mead have aggressively marketed their cow's milk-based products as medically

27   endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infants

28   births.

- 6 -

32.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk.  None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

33.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

34.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

35.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed.  The Code also forbade advertising or other forms of promotion of formula to the general public as well as providing sample products to mothers or members of their families.

36.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

37.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies,

1  and we support its goal to increase breastfeeding.   We also recognize that for infants who aren't

2  breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative

3  to meet babies' nutritional needs."   This statement ignores the existence of donor milk, as well as

4  human milk-based formula.

5  38.   Abbott markets and sells multiple products specifically targeting preterm and low-birth-

6  weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers,

7  Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac

8  Special Care 30.   In advertising these products, Abbott emphasizes the products' purported ability to

9  assist underdeveloped babies in reaching their growth targets.   For example, on the since-edited

10  webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9

11  months in the womb, so her body is working hard to catch up.   During her first full year, feed her

12  Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help

13  support her development."   Yet, no mention was made of the accompanying significantly increased

14  risk of NEC.   At some point, the website was edited to remove this statement.   However, upon

15  information and belief, the statement remained on the website until at least December 2020.

16  39.   Mead markets and sells multiple products specifically targeting premature infants, including

17  Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein,

18  Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with

19  Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and

20  Enfamil Human Milk Fortifier (acidified liquid and powder).   In advertising these products, Mead

21  emphasizes the purported similarities between its formula and breast milk, while failing to include

22  any information about the nutritional deficits and dangers that accompany formula use.   For example,

23  the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas

24  during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and

25  noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty

26  acids found naturally in breast milk) to support brain and eye development."

27  40.   One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is

28  entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of

the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

41.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

42.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

43.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:

COMPLAINT AND DEMAND FOR JURY TRIAL





44.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infants.

### *The Defendant Manufacturers' Inadequate Warnings*

45.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

COMPLAINT AND DEMAND FOR JURY TRIAL

46.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

47.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

48.     Mead cites no medical literature or research to guide the use of its products.

49.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

50.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

51.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

52.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

53.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

54.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

COMPLAINT AND DEMAND FOR JURY TRIAL

55.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

56.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Dignity's Failure to Warn*

57.     On information and belief, Dignity was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients. Dignity knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. However, instead of warning of those dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infants, Dignity has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.

58.     In fact, numerous Dignity medical facilities and hospitals throughout California purport to adhere to the tenets of the "Baby-Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby-Friendly Hospital Initiative" specifically targets a reduction in the rates of necrotizing enterocolitis in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Yet even though Dignity's birth facilities elsewhere in California have gained "Baby-Friendly Hospital" designation status, Bakersfield Memorial has not.

59.     Dignity is and has been aware that human breastmilk provides significant health benefits to premature infants, including protection from disease and illness, such as NEC. Dignity, through its website and other materials, has expressly recognized that human breast milk is easier for infants to digest than cow's milk-based formula due to its biological properties, and that cow's milk-based formula is inferior to breastmilk because breastmilk "has many proteins that fight bacteria and viruses,

and may reduce . . . gastrointestinal diseases . . . while formula has no disease fighting or protective components."

60.     Although Dignity knew or should have known of the serious danger of the Defendant Manufacturers' products, Dignity has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at Bakersfield Memorial.  As a result, the Injured Infants were fed the Defendant Manufacturers' cow's milk-based products at Bakersfield Memorial, causing their injuries.  This occurred even though hospitals across the country, including Dignity's own hospitals, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

61.     Dignity's failure to warn of the risks posed by the Defendant Manufacturer's products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, Dignity has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount and has granted their sales representatives have provided deceptive information that Dignity reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra saalespersons."

### *Safer Alternative Designs*

62.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.  The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

63.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

64.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

**FIRST CAUSE OF ACTION**
**STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

65.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

66.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

67.     Abbott and Mead also owed a duty to the consuming public in general, and Plaintiffs in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

68.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infants and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.  Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

69.     The Injured Infants ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infants outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

70.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

71.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

- 14 -

COMPLAINT AND DEMAND FOR JURY TRIAL

72.      Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

73.      Abbott's and/or Mead's products were fed to the Injured Infants, which directly and proximately caused their NEC and led to injury.

74.      As a further direct result, Plaintiffs suffered significant emotional distress, loss of income, and/or other harms.  Their lives have been significantly affected by the Injured Infants' injuries.

**SECOND CAUSE OF ACTION**
**STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Abbott and Mead)**

75.      Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

76.      Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

77.      Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.  By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.  The failure to warn makes the products at issue in this litigation unreasonably dangerous.

78.      Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infants, and that their products might cause the Injured Infants to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.  Among other risks, the Defendant Manufacturers:

a. Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infants; and/or

b. Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infants; and/or

c. Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parents; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

79. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

80. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infants were fed cow's milk-based products, which caused them to develop NEC.

81. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants

1  cow's milk-based formula, they would not have fed the Injured Infants those products.  Had the

2  Plaintiff Parents known of the significant risks of feeding the Injured Infants cow's milk-based

3  formula, they would not have allowed such products to be fed to the Injured Infants.

4  82.     As a further direct result, Plaintiffs suffered significant emotional distress, loss of income,

5  and/or other harms.  Their lives have been significantly affected by the Injured Infants' injuries.

6  

**THIRD CAUSE OF ACTION**
NEGLIGENCE
**(Against Abbott and Mead)**

7  

8  83.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

9  84.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation,

10  owed a duty to the consuming public in general, and Plaintiffs in particular, to exercise reasonable

11  care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm

12  to users, when such products are used in their intended manner and for their intended purpose.

13  85.     At all times relevant to this action, the Injured Infants' healthcare professionals and medical

14  staff used the products at issue in their intended manner and for their intended purpose.

15  86.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created,

16  manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based

17  infant products at issue in this litigation and thereby breached their duty to the general public and

18  Plaintiffs.

19  87.     Specifically, although Abbott and Mead knew or reasonably should have known at the time

20  of production that their cow's milk-based infant products significantly increased the risk of NEC,

21  serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty

22  by:

23          a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC,

24               severe injury, and death for the Injured Infants; and/or

25          b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for

26               premature infants like the Injured Infants; and/or

27          c.   Inserting warnings and instructions that are severely inadequate, vague, confusing, and

28               provide a false sense of security in that they warn and instruct specifically on certain

conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parents; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

88.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

89.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infants were fed cow's milk-based products, which caused them to develop NEC.  Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infants would not have been exposed to their unreasonably dangerous cow's milk-based products.

90.    As a further direct result, Plaintiffs suffered significant emotional distress, loss of income, and/or other harms.  Their lives have been significantly affected by the Injured Infants' injuries.

COMPLAINT AND DEMAND FOR JURY TRIAL

**FOURTH CAUSE OF ACTION**
**INTENTIONAL MISREPRESENTATION**
**(Against Abbott and Mead)**

91.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

92.    At all times relevant to this action, the Injured Infants consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

93.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

94.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

95.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infants were fed their products:

    a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.   That cow's milk-based products were safe for premature infants; and/or

    e.   That cow's milk-based products were necessary for optimum growth; and/or

    f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

COMPLAINT AND DEMAND FOR JURY TRIAL

g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

96.   Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

97.   The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infants' physicians and medical staff, to provide their infant products to babies, including the Injured Infants.

98.   The Plaintiff Parents were not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parents to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infants would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

99.   As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infants, causing their NEC and subsequent injuries.

100.   As a further direct result, the Plaintiff Parents have suffered significant emotional distress, loss of income, and/or other harms.  Their lives have been significantly affected by the Injured Infants' injuries.

### FIFTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### (Against Abbott and Mead)

101.   Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

102. At all times relevant to this action, the Injured Infants consumed the products at issue in their intended manner and for their intended purpose.

103. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

104. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

105. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infants were fed their products:

    a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d. That cow's milk-based products were safe for premature infants; and/or

    e. That cow's milk-based products were necessary for optimum growth; and/or

    f. That cow's milk-based products were similar or equivalent to breast milk; and/or

    g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

106.    Abbott and Mead were negligent or careless in not determining those representations to be false.

107.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infants' physicians and medical staff, to provide their products to babies, including the Injured Infants.

108.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parents to allow their children to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infants would not have been exposed to their unreasonably dangerous cow's milk-based products.

109.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infants, causing their NEC and subsequent injuries.

110.    As a further direct result, Plaintiffs suffered significant emotional distress, loss of income, and/or other harms.  Their lives have been significantly affected by the Injured Infants' injuries.

## SIXTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO WARN
#### (Against The Hospitals)

111.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

112.    The Hospitals, as a purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose.

COMPLAINT AND DEMAND FOR JURY TRIAL

113.    At all times relevant to this action, the Injured Infants used the cow's milk-based products purchased, supplied, and/or distributed by The Hospitals in their intended manner and for their intended purpose.

114.    The Hospitals employed or contracted with the healthcare professionals and medical staff at the Hospitals, managing these individuals during their treatment of the Injured Infants.

115.    The Hospitals negligently supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infants.

116.    Moreover, at all relevant times, The Hospitals knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at the The Hospitals Hospitals.  The Defendant Manufacturers' sales representatives were encouraged to interact with The Hospitals' healthcare professionals and medical staff.  These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt The Hospitals' healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parents.

117.    The Hospitals also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to The Hospitals' healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

118.    The Hospitals knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

119.    Nonetheless, The Hospitals failed to act in a reasonably prudent manner and breached their duty by:

        a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infants; and/or

c. Failing to warn or instruct their healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d. Failing to provide their healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to The Hospitals' healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

121. The Hospitals knew or reasonably should have known that their medical professionals and the parents of premature infants, including the Plaintiff Parents, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

122. Had The Hospitals exercised reasonable care by satisfying their duty to warn their medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the

1  Injured Infants would not have been exposed to the Defendant Manufacturers' cow's milk-based
2  products.

3  123.   As a direct and proximate result of The Hospitals' failure to warn of the danger posed by the
4  Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infants
5  were fed the Defendant Manufacturers' cow's milk-based products, which caused them to develop
6  NEC and significant injuries and/or death.

7  124.   As a further direct and proximate result of The Hospitals' negligent failure to warn of the
8  Defendant Manufacturers' unreasonably dangerous products, Plaintiffs suffered significant emotional
9  distress, loss of income, and/or other harms.   Their lives have been significantly affected by the
10  Injured Infants' injuries.

11                              **PRAYER FOR RLIEF**

12         WHEREFORE, Plaintiffs pray for judgment as follows:

13  125.   For compensatory damages in an amount to be proven at trial;

14  126.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain
15  and suffering, mental anguish, and other non-economic losses sustained as a result of Defendants'
16  conduct;

17  127.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost
18  profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental
19  health treatment which have or may be recommended;

20  128.   For loss of financial support, services, funeral expenses, companionship, comfort, assistance,
21  affections, and all other wrongful death damages permitted by law;

22  129.   For punitive damages resulting from Defendants' oppressive, fraudulent, and/or malicious
23  conduct, as permitted by law;

24  130.   For interest as permitted by law;

25  131.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action;
26  and

27  132.   For such other and further relief as the Court deems proper.

28

1

**DEMAND FOR JURY TRIAL**

2

133.     Plaintiffs hereby demand a jury trial for all claims triable.

3

4

Dated: April 6, 2022.

5

Respectfully submitted,

6

*/s/ M. Elizabeth Graham*

7

M. Elizabeth Graham (Bar No.143085)
**GRANT & EISENHOFER, P.A.**

8

201 Mission Street, Suite 1200
San Francisco, CA 94105

9

Telephone: (415) 293-8210
Fax: (415) 789-4367

10

Email: egraham@gelaw.com

11

*/s/ Paige J. Alderson*

12

Paige J. Alderson (Pro Hac Vice forecoming)
**GRANT & EISENHOFER, P.A.**

13

123 Justison Street
Wilmington, DE 19801

14

Telephone: (302) 622-7131
Fax: (302) 622-7100

15

Email: palderson@gelaw.com

16

*/s/ Fidelma Fitzpatrick*

17

Fidelma Fitzpatrick (Pro Hac Vice forthcoming)
**MOTLEY RICE LLC**

18

55 Cedar Street, Suite 100
Providence, RI 02903

19

Telephone: (401) 457-7728
Facsimile (401) 457-7708

20

21

*Attorneys for Plaintiffs*

22

23

24

25

26

27

28

- 26 -

COMPLAINT AND DEMAND FOR JURY TRIAL

**Vickers v. Mead Johnson & Company, LLC**

**Case No:  1:22-CV-00773-JLT-BAK**

# EXHIBIT B

# Exhibit B

# Low McKinley & Salenko, LLP
*Attorneys at Law*

---

**Sacramento**
2150 River Plaza Drive, Suite 250
Sacramento, CA 95833
Telephone: (916) 231-2400
Facsimile: (916) 231-2399

**Pleasant Hill**
2300 Contra Costa Blvd., Suite 260
Pleasant Hill, CA 94523
Telephone: (925) 627-3500
Facsimile: (916) 231-2399

Donna W. Low
Steven M. McKinley
Bruce E. Salenko
Steven R. Enochian
Nicholas J. Leonard
Tiffany C. Sala
*Christopher R. Jones
Spencer B. Pavelchik
David L. Ditora

---

*Admitted in Massachusetts

**Reply To: Sacramento Office**

June 16, 2022

M. Elizabeth Graham
Grant & Eisenhofer, P.A.
201 Mission Street, Suite 1200
San Francisco, CA 94105

Paige J. Alderson
Grant & Eisenhofer, P.A.
123 Justison Street
Wilmington, DE 19801

Fidelma Fitzpatrick
Carmen Scott
Laura Stemkowski
Motley Rice LLC
55 Cedar Street, Suite 100
Providence, RI 02903

Re:     Vickers v. Dignity Health dba Bakersfield Memorial Hospital

Dear Ms. Graham, Ms. Alderson, Ms. Fitzpatrick, Ms. Scott, and Ms. Stemkowski:

Pursuant to California Code of Civil Procedure sections 430.41(a) and 435.5(a), I write in an effort to meet and confer and avoid the necessity of filing a Demurrer and Motion to Strike the Complaint on behalf of my clients Dignity Health dba Bakersfield Memorial Hospital (hereafter "Bakersfield Memorial"). The Complaint improperly alleges a

Vickers v. Dignity Health dba Bakersfield Memorial Hospital
June 16, 2022
Page 2

negligent failure to warn cause of action against a hospital. Furthermore, the Complaint improperly includes Ashley Vickers as an individual Plaintiff and improperly use a pseudonym for Plaintiff D.H. The Complaint also improperly prays for punitive damages in violation of Code of Civil Procedure section 425.13(a) and improperly seeks attorney fees in violation of Code of Civil Procedure section 1033.5. Please dismiss my client from this matter by June 21, 2022 or my office will proceed with a Demurrer and Motion to Strike the Complaint. If additional time is needed to dismiss my client or you wish to further meet and confer on any issue, a reasonable extension will be given so long as Plaintiffs agree to a reasonable extension for my client to file a responsive pleading.

**The Complaint fails to State the sole Cause of Action against Bakersfield Memorial for Negligent Failure to Warn because Plaintiffs are improperly alleging a negligent failure to warn cause of action against a hospital**

Products liability claims for negligent failure to warn can only be properly alleged against manufacturers, distributors, and sellers. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002; see also *Webb v. Special Elec. Co.* (2016) 63 Cal.4th 167, 181.) Notably, California courts have not considered hospitals as distributors or sellers of products used in the course of providing medical services. As explained in *Silverhart v. Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1027:

> A hospital is not ordinarily engaged in the business of selling any of the products or equipment its uses in providing such services. The essence of the relationship between a hospital and its patients does not relate essentially to any product or piece of equipment it uses but to the professional services it provides.

A hospital's "primary function" is to "provide medical services." (*Silverhart v. Mount Zion Hosp.* (1971) 20 Cal.App.3d 1022, 1027-28 [hospital not liable for allegedly defective surgical needle because "a hospital furnishing a [product] as part of the medical services it provides is not a seller engaged in the business of selling [products]"); *San Diego Hosp. Ass'n. v. Superior Court* (1994) 30 Cal.App.4th 8, 16 [hospital not liable for injuries caused to physician by allegedly defective laser because "[t]he hospital is not in the business of selling or even leasing, bailing or licensing equipment to the physician. It is in the business of providing medical services to its patients . . . The fact the hospital provides equipment for the physician's use is incidental to the overriding purpose of providing medical services"); *Hector v. Cedars-Sinai Med. Ctr.* (1986) 180 Cal.App.3d 493, 504 [hospital not liable for personal injury resulting from defective pacemaker because it "is not 'engaged in the business of distributing [products] to the public' . . . and does not play 'an integral and vital part in the overall production or marketing' of [products]"); *Shepard v. Alexian*

Vickers v. Dignity Health dba Bakersfield Memorial Hospital
June 16, 2022
Page 3

*Bros. Hosp.* (1973) 33 Cal.App.3d 606, 611-612 [hospital not liable for personal injury where plaintiff contracted hepatitis from blood transfusion because "[t]he patient who enters a hospital goes there not to buy [products], but to obtain a course of treatment"].)

In *Pierson v. Sharp Memorial Hospital, Inc.* (1989) 216 Cal.App.3d 340, 346, the court further held defendant hospital could not be strictly liable for a non-medical device, a defective carpet, because hospitals are "providers of professional medical services rather than producers or marketers of products" and "engaged in the process of providing everything necessary to furnish the patient with a course of treatment." The court further explained its conclusion that the hospital "may not be held strictly liable in tort is consistent with case law characterizing hospitals as providers of professional medical services rather than producers or marketers of products." (*Ibid.*)

Here, Plaintiffs concede Bakersfield Memorial "employed or contracted with the healthcare professionals and medical staff at the Hospitals, managing these individuals during their treatment of the Injured Infants" (Complaint, pp. 23:4-5.) Furthermore, Plaintiffs' sole cause of action against Bakersfield Memorial stems from its staff allegedly feeding Plaintiff D.H. cow's milk-based products shortly after D.H. was born prematurely on November 2, 2021. (Complaint, pp. 2:9-13 and 3:1-4.) As such, Bakersfield Memorial was rendering professional medical service and was not producers or marketers of the products at issue in this matter. The products at issue in this matter were given to D.H. in the course of treatment after he was born prematurely. As such, Plaintiffs' sole cause of action against Bakersfield Memorial has no merit because Bakersfield Memorial was the provider of medical services and Plaintiffs cannot show that Bakersfield Memorial was a manufacturer, distributor, or supplier of the relevant products.

**The Complaint fails to State the sole Cause of Action of Plaintiff Ashley Vickers Individually against Bakersfield Memorial for Negligent Failure to Warn because Ashley Vickers is not a proper individual Plaintiff**

"In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." (*Thing v. La Chusa* (1989) 48 Cal. 3d 644, 647.) Here, the Complaint alleges that "[s]hortly after D.H. first ingested the Defendant Manufacturers' products, he developed NEC." (Complaint, pp. 4:5.) The Complaint further alleges "D.H. was forced to stay in the NICU longer, treated with antibiotics and Occupational Therapy and has continued to suffer long term health issues." (Complaint, pp. 4:6-7.) Notably, the Complaint does not allege Plaintiff Ashley

Vickers v. Dignity Health dba Bakersfield Memorial Hospital
June 16, 2022
Page 4

Vickers suffered a physical injury or was aware D.H. was suffering injuries at the time the alleged injuries occurred.  As such, Plaintiff Ashley Vickers fails to state a cause of action against Bakersfield Memorial individually.

**The Complaint fails to State the sole Cause of Action of Plaintiff "D.H." against Bakersfield Memorial for Negligent Failure to Warn because the Complaint does not properly identify "D.H."**

Every action must be prosecuted in the name of the real party in interest, except as otherwise provided by statute.  Here, the Complaint does not state the legal name of Plaintiff D.H. and defense counsel is aware of no applicable statute.  Furthermore, Plaintiffs have failed to file "a confidential information form" as required when filing confidentially under other statutes.  (See Code of Civil Procedure section 367.3 and Civil Code section 1708.85(f)(1).)  As such, Bakersfield Memorial cannot confirm the identity of Plaintiff in this matter.

**Plaintiff's prayer for punitive damages must be stricken because Plaintiff failed to meet the requirements of Code of Civil Procedure section 425.13**

Code of Civil Procedure section 436 allows a Motion to Strike any irrelevant matter inserted in any pleading and to strike any pleading or part thereof not drawn in conformity with the laws of this state.  Here, the Complaint, pp. 25:22-23, improperly includes the following prayer for damages:

> 129.  For punitive damages resulting from Defendants' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

Code of Civil Procedure section 425.13 (a) notes:

> In any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed.

As explained by the California Supreme Court, the purpose of section 425.13 is "to protect health care providers from the onerous burden of defending against meritless punitive damage claims.  We hold that the statute achieves this goal by requiring the plaintiff to both state and substantiate a legitimate, triable punitive damages claim." (*Coll. Hosp. Inc. v. Superior Court* (1994) 8 Cal. 4th 704, 709.)  As such, Plaintiffs' prayer for exemplary damages against Bakersfield Memorial is improper.

Vickers v. Dignity Health dba Bakersfield Memorial Hospital
June 16, 2022
Page 5

Furthermore, Plaintiff has failed to plead facts sufficient to support punitive damages under Civil Code section 3294.  CCP section 3294 includes the following definitions:

> (1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.

> (2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

> (3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

Here, the allegations in the Complaint against Bakersfield Memorial at most constitute "professional negligence of a health care provider" and clearly do not indicate oppression, fraud, or malice.  As such, Plaintiff's prayer for punitive damages is further improper.

**Plaintiff's prayer for attorney's fees has no legal basis and must be stricken**

Code of Civil Procedure section 436 allows a Motion to Strike any irrelevant matter inserted in any pleading and to strike any pleading or part thereof not drawn in conformity with the laws of this state. Here, the Complaint, pp. 25:25-26, includes a prayer for attorney's fee, but cites no legal basis for this prayer. Notably, attorney's fees are not recoverable unless specifically allowed by statute. (Code of Civil Procedure section 1033.5(b)(5)(a).)

**Conclusion**

As explained above, the Complaint improperly alleges a Negligent Failure to Warn cause of action against a hospital.  Furthermore, the Complaint improperly includes Ashley Vickers as an individual Plaintiff and improperly uses a pseudonym for Plaintiff D.H.  The Complaint also improperly prays for punitive damages in violation of Code of Civil Procedure section 425.13(a) and improperly seeks attorney fees in violation of Code of Civil Procedure section 1033.5.

Vickers v. Dignity Health dba Bakersfield Memorial Hospital
June 16, 2022
Page 6

Please dismiss my client from this matter by June 21, 2022 or my office will proceed with a Demurrer and Motion to Strike the Complaint. If additional time is needed to dismiss my client or you wish to further meet and confer on any issue, a reasonable extension will be given so long as Plaintiffs agree to a reasonable extension for my client to file its responsive pleading.

Please feel free to contact me if you wish to discuss this matter further.

Very truly yours,

**LOW McKINLEY & SALENKO, LLP**

Nicholas J. Leonard

NJL:njl